**Elizabeth A. KRAL, formerly known as Elizabeth A. Teller, Petitioner,**

v.

**AMERICAN HARDWARE MUTUAL INSURANCE COMPANY, Respondent.**

**No. 88SC9.**

Supreme Court of Colorado, En Banc.

Dec. 18, 1989.

Cleveland, Wengler & Robbins, P.C., Daniel B. Stageman, Colorado Springs, for petitioner.

White & Steele, P.C., R. Eric Peterson, Michael W. Anderson and Sandra Spencer Coleman, Denver, for respondent.

Justice KIRSHBAUM delivered the Opinion of the Court.

In *Kral v. American Hardware,* 754 P.2d 411 (Colo.App.1987), the Court of Appeals affirmed a summary judgment entered by the El Paso County District Court in favor of respondent American Hardware Mutual Insurance Company (American Hardware) against Elizabeth A. Kral (Kral). The trial court held that, pursuant to the subrogation clause of an insurance contract and the terms of a release-trust agreement executed by Kral, American Hardware was entitled to recover monies paid by it to Kral under an uninsured motorist clause of the insurance contract. The Court of Appeals held that in the circumstances of this case the subrogation clause and release-trust agreement did not violate public policy. Having granted certiorari to review this conclusion, we reverse the judgment of the Court of Appeals and remand the case to that court with directions.

I

On August 17, 1980, Kral's husband, Joseph W. Teller, was killed when a vehicle he was driving was struck by a car operated by Norman Englebaugh. The vehicle Teller drove was owned by his employer and was insured under a contract of insurance issued by American Hardware. The insurance contract provided uninsured motorist benefits in the maximum amount of $30,000 and contained the following provisions concerning such coverage:

> We will pay all sums the insured is legally entitled to recover as damages from the owner or driver of an uninsured motor vehicle. The damages must result from bodily injury sustained by the insured caused by an accident. The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the uninsured motor vehicle.

The policy also contained the following pertinent language:

> E. OUR LIMIT OF LIABILITY
>
> . . . .
>
> 2. Any amount payable under this insurance shall be reduced by:
>
> . . . .
>
> b. All sums paid by or for anyone who is legally responsible, including all sums paid under the policy's LIABILITY INSURANCE.
>
> . . . .
>
> F. CHANGES IN CONDITIONS
>
> . . . .
>
> 3. OUR RIGHT TO RECOVER FROM OTHERS is changed by adding the following:

If we make any payment and the insured recovers from another party, the insured shall hold the proceeds in trust for us and pay us back the amount we have paid.

Kral filed a civil action against Englebaugh on December 1, 1980, and determined through discovery that Englebaugh was uninsured. Kral then filed a claim against American Hardware under the uninsured motorist provision of the insurance contract. On December 18, 1980, American Hardware paid Kral $30,000 and Kral executed a release-trust agreement containing the following pertinent language:

Further, I state that I have instituted an action against Norman A. Englebaugh (the operator of the uninsured automobile) ... and I agree to withhold 15% of any monies received in such action as the result of settlement or judgment in trust for American Hardware Mutual, to be paid to said company immediately upon the same coming into my hands. I agree to be solely responsible for costs incurred in said action. In the event that an offer of settlement is received from the adverse party, I agree to advise American Hardware Mutual before accepting the same.[1]

On May 5, 1981, Kral filed an amended complaint in her pending civil action. The amended complaint added Adams Apple Lounge, Inc., a lounge Englebaugh allegedly visited the night of the accident, as a defendant. In July of 1983, Kral again amended her complaint to include as additional defendants Gary Windom and Don Bates, d/b/a Bates and Windom Insurance Agency.[2] As amended, Kral's complaint alleged that Adams Apple negligently sold alcoholic beverages to Englebaugh and that Windom and Bates negligently misrepresented the status of the liability insurance coverage for Adams Apple's operations.

On July 15, 1985, Kral settled her claims against Adams Apple, Windom and Bates for the sum of $177,500. She notified American Hardware of the settlement and advised American Hardware that she intended to dismiss her claims against Englebaugh. American Hardware consented to the dismissal of the claims against Englebaugh but demanded payment from Kral of $26,635, representing fifteen percent of the settlement she had obtained from Adams Apple, Windom and Bates.

Kral then filed this civil action in the El Paso County District Court seeking a declaration that the subrogation clause of the insurance contract and the release-trust agreement were unenforceable because they were contrary to public policy. Kral moved for summary judgment on her claim, and American Hardware filed a motion for summary judgment alleging that it was entitled to payment of the $26,635 pursuant to the release-trust agreement. On March 11, 1986, the trial court granted American Hardware's motion and denied Kral's motion. The trial court concluded that although Kral's retention of the settlement proceeds and the $30,000 she had received from American Hardware would not constitute double recovery, the release-trust agreement did not violate public policy and was enforceable.

On appeal, the Court of Appeals affirmed the trial court's judgment. Relying on *Granite State Insurance Co. v. Dundas,* 34 Colo.App. 382, 528 P.2d 961 (1974), it held that the subrogation clause and the release-trust agreement did not violate the public policy of this state because uninsured motorist protection was optional rather than mandatory and because section

---

1. This language appears in an addendum modifying American Hardware's standard release-trust agreement. The addendum was drafted by Kral's attorney. American Hardware's standard release-trust agreement provides that "any sum received in excess of the amount paid by the company, including legal or other expenses ... shall be retained by [the insured]."

2. Various pleadings and documents in the record refer to this entity as Don Bates Insurance, Don Bates Insurance Company, and Don

10–4–609, 4 C.R.S. (1979 Supp.),[3] does not expressly prohibit subrogation.

## II

The provisions regulating the availability of insurance protection against uninsured motorists are set forth in section 10–4–609, 4 C.R.S. (1979 Supp.). The statute is designed to protect persons from the often devastating consequences of motor vehicle accidents. *Marquez v. Prudential Property & Casualty Ins. Co.*, 620 P.2d 29 (Colo. 1980); *Newton v. Nationwide Mut. Fire Ins. Co.*, 197 Colo. 462, 594 P.2d 1042 (1979).

At the time of the accident, section 10–4–609 provided in pertinent part as follows:

No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for ... death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state ... unless coverage is provided therein ... in limits for bodily injury or death set forth in section 42–7–103(2), C.R.S., [of the Motor Vehicle Insurance Responsibility Act] under provisions approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of ... death resulting therefrom; except that the coverage required under this section shall not be applicable where any insured named in the policy rejects the coverage and except that, unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer.

§ 10–4–609, 4 C.R.S. (1979 Supp.). The statute requires insurers to offer their customers the opportunity to protect themselves from loss caused by negligent conduct of drivers who have not obtained insurance to pay for such loss. The coverage enables the insured to gain compensation for loss due to the negligent conduct of non-insured motorists in the same manner as the insured would be compensated for loss due to the negligent conduct of insured motorists.

In many jurisdictions statutes expressly authorize insurers to limit their liability for uninsured motorist benefits.[4] These statutes vary greatly with respect to the amount and kind of limitations on liability that may be imposed. *See, e.g.*, Minn. Stat. 65B.53(2) (1988) (allowing subrogation only to avoid non-duplication of coverage); Mich.Stat.Ann. § 24.13177 (1987) [M.C.L. § 500.3177] (subrogation limited to owner of uninsured vehicle); Va.Code § 38.2–2206 (1986) (subrogation to all rights of the insured). Section 10–4–609 contains no such provision. Kral argues that because the General Assembly has not expressly authorized insurers to limit liability for uninsured motorist benefits an insurer may in

Bates Agency. We have adopted the designation used by the trial court in its final order.

**3.** The statute was repealed and reenacted with amendments on May 4, 1983. Ch. 92, sec. 1, § 10–4–609, 1983 Colo.Sess. Laws 454. The amended statute is now codified at § 10–4–609, 4A C.R.S. (1987). However, for all times pertinent to this case the applicable law was the 1979 statute.

**4.** *See* Ark.Code Ann. § 23–89–405 (1987); Del. Code Ann. title 18, § 3902(a)(4) (Cum.Supp. 1988); Ill.Rev.Stat. ch. 73, para. 755a(4) § 143(4) (1989); Ind.Code § 27–7–5–6 (1986); Iowa Code § 516A.4 (1989); Ky.Rev.Stat.Ann. § 304.20–020(4) (Michie/Bobbs–Merrill 1988); La.Rev.Stat.Ann. § 22:1406(D)(4) (West 1989); Me.Rev.Stat.Ann. title 24–A, § 2902(4) (1964); Mass.Gen.L. ch. 175, § 113L(4) (1987); Mich. Stat.Ann. § 24.13177 [M.C.L. § 500.3177] (1987); Minn.Stat. § 65B.53(2) (1988); Mo.Rev. Stat. § 379.203(4) (1983); Nev.Rev.Stat. § 690B.020(5) (1986); N.H.Rev.Stat.Ann. § 264.14 (1987); N.C.Gen.Stat. § 20–279.21(b)(4)(f) (1983); N.D.Cent.Code § 26–02–44 (Repl.Vol.1978); Ohio Rev.Code Ann. § 3937.18(E) (Anderson 1989); Okla.Stat. title 36, § 3636(E) (Cum.Supp. West 1989); Ore. Rev.Stat. 743.792(11) (Repl.1987); Pa.Cons.Stat. title 40, § 2000(d) (1971); Tenn.Code Ann. § 56–7–1204 (1989); Tex.Ins.Code Ann. § 5.06–1(6) (Vernon 1981); Vt.Stat.Ann. title 23, § 941(e) (1987); Va.Code Ann. § 38.2–2206 (1986); Wash.Rev.Code § 48.22.040(3) (1987); Wyo.Stat. § 31–10–104 (1984).

no circumstances reduce the amount of sums otherwise payable to an insured pursuant to an uninsured motorist provision of an insurance contract by means of a subrogation clause or a release-trust agreement. Alternatively, she argues that agreements limiting insurers' liability for uninsured motorist benefits should be deemed enforceable only to the extent such reduction in benefits would not impair the ability of the insured to achieve full compensation for any loss caused by the conduct of an uninsured motorist. We agree with Kral's alternative argument.

### A

The General Assembly first enacted legislation to protect persons injured by uninsured motorists in 1965, as part of the comprehensive Motor Vehicle Financial Responsibility Act. Ch. 91, sec. 1, 1965 Colo. Sess. Laws 333. The declaration of purpose prefacing this legislation contained the following pertinent language:

**Declaration of purpose.**—The general assembly is acutely aware of the toll in human suffering and loss of life, limb, and property caused by negligence in the operation of motor vehicles in our state. Although it recognizes that this basic problem can and is being dealt with by direct measures designed to protect our people from the ravages of irresponsible drivers, the general assembly is also very much concerned with the financial loss visited upon innocent traffic accident victims by negligent motorists who are financially irresponsible. In prescribing the sanctions and requirements of this act, it is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists.

Ch. 91, sec. 1, 1965 Colo. Sess. Laws 333. This language demonstrates a legislative intent to permit insureds to protect themselves against loss, up to policy limits, resulting from the negligent conduct of financially irresponsible motorists. *See Newton v. Nationwide Mut. Ins. Co.*, 197 Colo. 462, 467, 594 P.2d 1042, 1045 (1979).

The current uninsured motorist statute, section 10–4–609(1), 4A C.R.S. (1987), requires an insurer to permit an insured to purchase a liability policy, or to offer as a supplement to automobile liability insurance, uninsured motorist protection in limits for bodily injury or death as established by section 42–7–103(2), 17 C.R.S. (1984). The latter statute defines an "automobile liability policy" to mean

a liability policy ... exclusive of interest and costs, of not less than twenty-five thousand dollars because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, to a limit of not less than fifty thousand dollars because of bodily injury to or death of two or more persons in any one accident....

§ 42–7–103(2), 17 C.R.S. (1984). When read together, section 10–4–609(1) and section 42–7–103(2) clearly establish the intent of the General Assembly to provide a mechanism by means of which an insured might purchase insurance coverage for protection against loss caused by the conduct of a negligent and financially irresponsible motorist.

This legislative intent is further reflected in subsections 4 and 5 of section 10–4–609, which provisions were added to the uninsured motorist coverage statute in 1983. Ch. 92, sec. 1, § 10–4–609(4), (5), 1983 Colo. Sess. Laws 454, 455. Those provisions state as follows:

(4) Uninsured motorist coverage shall include coverage for damage for bodily injury or death which an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle. An underinsured motor vehicle is a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident, but the limits of liability for bodily injury or death under such insurance or bonds are:

(a) Less than the limits for uninsured motorist coverage under the insured's policy; or

(b) Reduced by payments to persons other than an insured in the accident to less than the limits of uninsured motorist coverage under the insured's policy.

(5) The maximum liability of the insurer under the uninsured motorist coverage provided shall be the lesser of:

(a) The difference between the limit of uninsured motorist coverage and the amount paid to the insured by or for any person or organization who may be held legally liable for the bodily injury; or

(b) The amount of damages sustained, but not recovered.

§ 10–4–609(4), (5), 4A C.R.S. (1987). Subsection 4 permits an injured insured to recover for loss caused by an underinsured motorist to the same extent the insured would recover if the underinsured motorist had no insurance. Subsection 5 measures the maximum limits of the insurer's liability by the extent of the insured's loss. When considered together, section 10–4–609(1), (4) and (5) and section 42–7–103(3) reflect a clear legislative purpose to place an injured party having uninsured motorist coverage in the same position as if the uninsured motorist had been insured. Any agreement to reduce the amount of benefits an insured might receive under an uninsured motorist clause of an insurance contract must be viewed in light of this legislative intent.

Had Englebaugh been insured, Kral could have obtained compensation from him as well as from the other defendants for her loss. The only limitations on her ability to recover would be the extent of her loss and the liability limits specified by the applicable contracts of insurance. Enforcement of the subrogation clause and release-trust agreement would place Kral in the position of having no greater protection against her loss than if uninsured motorist coverage had not been purchased. This result would contravene the strong policy adopted by the General Assembly to enable an insured who purchases uninsured motorist protection to receive the benefits of that coverage to the extent necessary for full compensation for loss caused by the negligent conduct of a financially irresponsible motorist.

B

This court has not previously considered the question of the enforcement of agreements reducing an insured's liability for uninsured motorist coverage when such enforcement would leave an insured less than fully compensated for loss caused by the negligent conduct of a financially irresponsible motorist.[5] However, in *Newton v. Nationwide Mutual Fire Insurance Co.*, 197 Colo. 462, 594 P.2d 1042, we held

5. Some courts have concluded that in the absence of express statutory authorization for subrogation clauses in insurance contracts insurers may not enforce agreements for subrogation when such enforcement would prevent an insured from receiving full compensation for sustained loss. *See, e.g., Alabama Farm Bureau Mut. Casualty Ins. Co. v. Humphrey,* 54 Ala.App. 343, 308 So.2d 255 (Ala.Civ.App.1975); *United Servs. Auto. Ass'n v. Cotter,* 241 So.2d 733 (Fla. App.1970); *Lyon v. Hartford,* 25 Utah 2d 311, 480 P.2d 739 (1971). Other courts have concluded that even when statutory provisions expressly authorize subrogation clauses insurers may not enforce subrogation agreements if to do so would prevent an insured from receiving full compensation for sustained loss. *See, e.g., Hughes v. State Farm Mut. Auto. Ins. Co.,* 604 F.2d 573 (8th Cir.1979); *White v. Nationwide Mut. Ins. Co.,* 361 F.2d 785 (4th Cir.1966); *Perez v. Ford Motor Co.,* 408 F.Supp. 318 (D.La.1975), *aff'd,* 527 F.2d 1391 (5th Cir.1976); *Capps v. Klebs,* 178 Ind.App. 293, 382 N.E.2d 947 (1978); *Wescott v. Allstate Ins. Co.,* 397 A.2d 156 (Me. 1979); *Michigan Mut. v. Shaheen,* 101 Mich.

App. 761, 300 N.W.2d 599 (1980); *Milbank Mut. Ins. Co. v. Kluver,* 302 Minn. 310, 225 N.W.2d 230 (1974); *Craig v. Iowa Kemper Mut. Ins. Co.,* 565 S.W.2d 716 (Mo.App.1978); *Raitt v. National Grange Mut. Ins. Co.,* 111 N.H. 397, 285 A.2d 799 (1971); *Walls v. City of Pittsburgh,* 292 Pa. Super. 18, 436 A.2d 698 (1981); *State Farm Mut. Auto. Ins. Co. v. Barnette,* 485 S.W.2d 545 (Tenn. 1972); *Hawaiian Ins. and Guar. Co. v. Mead,* 14 Wash.App. 43, 538 P.2d 865 (1975).

A few courts have construed express legislative authorization for subrogation of benefits to permit enforcement of subrogation agreements even if to do so would prevent any insured from receiving full compensation for sustained loss. *See Thatcher v. Eichelberger,* 102 Ill.App.3d 231, 57 Ill.Dec. 816, 429 N.E.2d 1090 (1981), *modified and reh'g denied* (1982); *Davenport v. AID Mut. Ins. Co.,* 334 N.W.2d 711 (Iowa 1983); *State Auto. Mut. Ins. Co. v. Cummings,* 519 S.W.2d 773 (Tenn.1975). These decisions illustrate the variety of approaches courts have adopted in construing particular legislative provisions peculiar to various jurisdictions.

that a clause of an insurance contract in effect authorizing a reduction in the insurer's obligation to pay uninsured motorist benefits because of the insured's receipt of benefits for personal injuries (P.I.P. benefits) violated the legislative policy of requiring insurers to pay at least the minimum amount of uninsured motorist benefits required by statute. The rationale of *Newton* supports our conclusion that the General Assembly intended uninsured motorist coverage to provide an insured with benefits to the extent necessary to recover for loss caused by a negligent and financially irresponsible motorist, subject to policy limits.

In another context, this court has found provisions of insurance contracts unenforceable when a contrary result would violate the intent expressed by the General Assembly in the Colorado Auto Accident Reparations Act, now codified at sections 10–4–701 to –723, 4A C.R.S. (1987 & 1989 Supp.) (the "No–Fault Act"). *Meyer v. State Farm Mut. Auto. Ins. Co.*, 689 P.2d 585 (Colo.1984) (household exclusion unenforceable because violative of purposes of No–Fault Act to avoid inadequate compensation to victims of automobile accidents); *Marquez v. Prudential Property & Casualty Ins. Co.*, 620 P.2d 29 (Colo.1980) (subrogation clause authorizing insurer to recover P.I.P. benefits paid to insured after insured received liability benefits from another insurer unenforceable because enforcement thereof would leave the insured not fully compensated for the injuries actually suffered). While these decisions do not control the issue here presented, they indicate the great weight that must be accorded legislative intent regarding benefits of insureds and obligations of insurers.

We have concluded that the statute requiring insurers to provide uninsured motorist coverage in or supplemental to liability insurance contracts reflects a strong legislative intent to permit insureds who purchase such coverage to receive the benefits thereof to the extent necessary for full compensation for loss caused by the negligent conduct of financially irresponsible motorists. To the extent any reduction of benefits payable to Kral under the unin-

sured motorist provision of the contract of insurance because of the terms of the subrogation clause and release-trust agreement would result in Kral's inability to obtain full compensation for the loss she sustained, the agreements would directly violate that legislative policy and would therefore be unenforceable.

### III

American Hardware asserts that the General Assembly's decision to allow insureds to decline to purchase uninsured motorist protection indicates that the legislature has exempted subrogation of uninsured motorist benefits from its general policy of requiring full compensation to insureds for loss sustained in automobile accidents. Our prior cases have suggested that no such abrogation of purpose can be imputed to the General Assembly's decision to allow insureds the choice of declining uninsured motorist coverage. *Newton v. Nationwide Mut. Fire Ins. Co.*, 197 Colo. 462, 594 P.2d 1042 (1979); *Marquez v. Prudential Property & Casualty Ins. Co.*, 620 P.2d 29 (Colo.1980); *Meyer v. State Farm Mut. Auto. Ins. Co.*, 689 P.2d 585 (Colo. 1984). Those insureds electing to purchase uninsured motorist coverage no doubt do so in the expectation that even if they are not fully compensated for their loss they will at least receive the amount of that benefit as a contribution toward such full compensation.

American Hardware relies on the decision of the Court of Appeals in *Granite State Insurance Co. v. Dundas*, 34 Colo. App. 382, 528 P.2d 961 (1974), to support the argument that the terms of the subrogation clause and release-trust agreement are enforceable. In *Granite State* an insurer sought a judicial order of remittitur of an arbitration award of $12,000 granted to its insured under an uninsured motorist clause of an insurance contract providing a benefit of $10,000. The trial court ordered remittitur and reduced the initial $12,000 award to $9,000. The trial court also ordered the insured to execute a release-trust agreement in favor of the insurer for repayment of the $9,000 uninsured motorist benefit to the extent the insured recovered damages for the loss from the tort-feasor

or others. On appeal, the Court of Appeals held that the court imposed release-trust agreement was enforceable.

· Clearly the insured in *Granite State* could not argue that enforcement of the release-trust agreement would result in his inability to achieve full compensation for his loss because his total loss as determined by the trial court was less than the uninsured motorist benefit contained in the contract of insurance. Kral does assert that argument. Thus *Granite State* is inapposite to the circumstances presented here.

### IV

■ The General Assembly has established that a person who purchases uninsured motorist coverage and sustains loss caused by the negligent conduct of an uninsured motorist is entitled to the benefits of such coverage to the extent necessary to fully compensate the insured for the loss, subject to the limits of the insurance contract. However, the General Assembly did not intend to grant windfall profits to insureds by authorizing them to obtain double recovery for the same loss. To the extent payment of all or part of the authorized uninsured motorist benefit to Kral would, when added to the settlement proceeds she received, result in her receiving sums in excess of her total loss, the insurer should be entitled to enforce the terms of the release-trust agreement.

The trial court entered summary judgment based upon its conclusion that Kral's receipt of the entire $30,000 uninsured motorist benefit under the policy would not constitute double recovery. However, the record suggests some disagreement between Kral and the insurer with regard to whether and to what extent the $177,000 Kral obtained in settlement of her civil action constitutes full compensation for her loss. Summary judgment is a drastic remedy and is appropriate only in the absence of dispute over material facts. C.R.C.P. 56(c); *Abrahamsen v. Mountain States Tel. & Tel. Co.*, 177 Colo. 422, 494 P.2d 1287 (1972). *See Mt. Emmons Mining Co. v. Crested Butte*, 690 P.2d 231 (Colo.1984). When the record is not adequate to permit a conclusion that no material fact dispute exists, the entry of summary judgment is inappropriate. In view of the uncertainty in the record with respect to the question of the extent of Kral's loss, and the further circumstance that neither the parties nor the trial court had the benefit of our views of the legislative intent with regard to the efficacy of agreements limiting the liability of insurers for payment of uninsured motorist benefits, we deem it appropriate to reverse the trial court's summary judgment and to remand this case to that court with directions to determine the motion for summary judgment by application of the principles enumerated herein.

### V

For the foregoing reasons, the judgments of the Court of Appeals and of the trial court are reversed. The case is remanded to the Court of Appeals with directions to remand to the trial court for further proceedings in view of the principles announced herein.